UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SCHMIDT,

        Plaintiff,                      Hon. Ellen S. Carmody

v.

                                        Case No. 1:18-cv-744

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____/

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 53 years of age on her alleged disability onset date. (PageID.198). She successfully completed high school, but has no past relevant work experience. (PageID.47). Plaintiff applied for benefits on May 12, 2015, alleging that she had been disabled since December 1, 2014, due to anxiety, depression, dependent personality disorder, and histrionic personality disorder. (PageID.198-212, 244). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.83-190).

On October 17, 2017, Plaintiff appeared before ALJ Christopher Mattia with testimony being offered by Plaintiff and a vocational expert. (PageID.54-81). In a written decision dated January 10, 2018, the ALJ determined that Plaintiff was not disabled. (PageID.36-48). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.27-32). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1] 
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

make a dispositive finding at any point in the review, no further finding is required.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.   *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.   *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.   While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) major depressive disorder; (2) generalized anxiety disorder; (3) dependent personality disorder; and (4) gambling disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.   (PageID.39-40)

---

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can understand, carry out, and remember simple instructions; (2) she can make simple work-related decisions; (3) she can occasionally interact with supervisors, co-workers, and the public; (4) she can occasionally deal with changes in a routine work setting; and (5) she can perform work that does not require a production line pace or where her co-workers' productivity is dependent upon her productivity. (PageID.40).

The ALJ found that Plaintiff had no past relevant work experience at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 61,000 light exertional jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.74-77). This represents a significant number of

jobs. *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'").

## I. Medical Evidence

In addition to the testimony presented at the administrative hearing, the administrative record contains copies of Plaintiff's statements and medical treatment records. The ALJ described this evidence as follows:

> As for the medical evidence, the claimant presented at Manistee-Benzie Community Mental Health Services in 2009 with thoughts of depression (2F at 2). She reported feelings of worthlessness, and stated that she felt incapable of doing anything and was overwhelmed with stressors (*Id.*). She reported no issues with getting along with others, had no problems with her education other that being a slow reader, and stated that she was currently taking Xanax for her anxiety (2F at 2-4). Upon examination, her appearance was within acceptable limits, she had impaired concentration, behavior was disinhibited, insight was impaired, affect was inappropriate, thought content was normal, and her mood was labile and anxious (2F at 5).
>
> The claimant next presented in 2011 with concerns over her financial situation (2F at 9). She stated that she felt overwhelmed and was struggling to pay her bills as an artist (*Id.*). She stated that there was a lot of insecurity in her family, and she had never seen a psychiatrist and had never been hospitalized (2F at 11). Upon examination, the claimant had acceptable intellectual functioning, her thought process was disorganized, she had psychomotor agitation, her general functioning was intact, mood was exaggerated, affect was inappropriate, and speech was acceptable (*Id.* at 10-12). The interviewer noted that the claimant's body language was overly dramatic, and she grimaced during the interview (*Id.*).
>
> The claimant presented at Crystal Lake Health Center in July 2013 with complaints of depression and anxiety (1F at 22). She reported difficulty concentrating and struggled with insomnia but denied suicidal ideation (1F at 22). Upon examination, there was no impairment of abstract thinking, her speech was slow, and her affect was anxious and depressed (*Id.* at 23). The claimant was prescribed Effexor, Xanax, and Trazodone (*Id.*). The claimant next presented in December 2014 complaining of worsening depression with depressed mood, fatigue, anxiety, and sense of failure (1F at 20). Her mental status exam indicated her cognition was intact and she continued to have anxious and depressed affect (*Id.* at 21). She had an intake evaluation at Central Wellness in December 2014 (2F at 16). She reported feeling

overwhelmed, tearful, with excessive worry and anxiety (2F at 16). She stated that she felt paralyzed by anxiety and stress and had difficulty following through on appointments and understanding what to do with her life (*Id.*). During the evaluation, she presented with poor coping skills, a dramatized and anxious mood, detached affect, soft speech, impaired short-term memory, and had difficulty expressing herself (*Id.* at 16-25).

At a January 2015 appointment, the claimant reported that her goals for treatment were to figure out who she was, apply for disability benefits, and have a cleaner home (2F at 27-29). She stated that her symptoms were moderate in intensity and improving (1F at 18; 2F at 42). At a psychiatric evaluation in March 2015, the claimant's current medications included Effexor, Trazodone, and Buspar (2F at 41). Dr. Charles Lapo described the claimant as vague and circumstantial during the interview, added Brintellix to her medications, and found she had average intellectual functioning, cheerful mood, normal communication, normal but circumstantial speech, unremarkable thought content, fair insight, and intact orientation (*Id.* at 44-47).

In April 2015, the claimant stated that she wanted intense therapy but also reported that she was starting to live her life again (*Id.* at 49-51). Her mood was pleasant, she had some depressive cognition, and there were some elements of mania to her speech (*Id.*). She had a normal mental status examination in May 2015 with normal mood (2F at 60). She stated in June 2015 that she believed the medications were helping with her condition and that she was working on her art projects more often (3F at 9). She stated in August 2015 that she was very busy with work, was getting her orders out, and she felt therapy was working (3F at 13). She also reported losing money gambling, and stated that she went to the casino weekly and sometimes more often (3F at 42).

In October 2015, the claimant's therapist, Brian Heyniger, submitted a letter stating that the claimant's ability to focus on her artwork had improved since beginning treatment at Centra Wellness (3F at 1). He stated that her current treatment included outpatient therapy, case management, psychiatric evaluations, and medication review for her major depressive disorder, dependent personality disorder, and gambling disorder (*Id.*). He stated that she was a pleasure to work with and used her sense of humor to help her cope with her anxiety and stress (Id). At an October 2015 therapy session, the claimant stated that she gambled and was trying to do this less but was having difficulty with self-control (3F at 23). She stated that she was lonely and not spending too much time with people (*Id.*). Her mood was described as euthymic, speech was spontaneous and fluent, there was no evidence of delusions, and she did not respond to internal stimuli (*Id.* at 24).

In November 2015, the claimant reported stress over completing orders for her artwork on time (3F at 46). Later that month, her counselor discussed gambling with her "and the difficulty of setting limits appearing to make it high risk vs. the

concept of it being an answer to her money issues" (4F at 9). The claimant then "moved to disability and the importance of staying mentally ill so she can keep her supports" (*Id.*). The claimant reported a positive outcome from her sister's visit for Christmas at a December 2015 appointment (4F at 3). She stated that she had the house clean for the visit and that she was able to treat her sister and husband to dinner with her gambling winnings (4F at 3). However, she also reported that month that she had gambled away her savings account (4F at 10). She also stated that she had met her orders for her micro-enterprise art business that year (*Id.* at 2 and 10). Upon examination, her thought process was described as disorganized and she was noted to frequently change the subject (*Id.* at 15). In her yearly progress note, the claimant was described as regularly attending sessions and was noted to show improvements in organization and overall progress in her recovery (*Id.* at 15 and 20).

The claimant stated in January 2016 that therapy was working and helping her make better choices for herself (4F at 27-28). She reported minor complaints and decreased energy but stated that she was sleeping well (7F at 13). She stated that her current goal was to finish her art work so she could get ready for the busy season (4F at 27). The claimant had a normal mental status examination in February 2016 (4F at 34). The claimant then stopped going to therapy (4F at 36). At a July 2016 medication management appointment, the claimant reported that the reason she stooped attending therapy is that she did not feel like attending therapy and stated that she would work it out on her own (*Id.* at 36). She stated that her mood had been better and that her ability to control her gambling was inconsistent (*Id.*). She stated that sometimes she pushed herself too hard on her art projects and stayed up all night working on them before a show (*Id.*). Upon examination, she had a cooperative attitude, normal appearance, normal psychomotor activity, normal communication, normal speech, mood was within normal limits, affect was appropriate, thought process was intact, concentration was normal, memory was normal, fund of knowledge was adequate, intellectual functioning was average, judgment was poor, and insight was fair (4F at 39). She reported continuing anxiety in August 2016 (7F at 10).

The claimant reported some difficulties with friends at a September 2016 medication management appointment (4F at 42). She stated that she tries to be independent but needs help with some things and was perhaps looking for more out of friendships than they could provide (*Id.*). She stated that she was continuing to gamble but was becoming "increasingly aware of how stupid it is" and was spending less money gambling (*Id.* at 43). In November 2016, she reported taking her Buspar once a day instead of twice a day as directed (Id. at 49). She stated that she had been working on changes and had cleaned her whole home, was working hard on completing orders for her business, and recently had all of her friends over for dinner (*Id.*). The claimant was described as cooperative during the session with normal appearance, normal psychomotor activity, normal communication, normal speech, mood was anxious, affect was appropriate, thought proves was

characterized by flight of ideas, thought contempt was intact, concentration was normal, memory was normal, fund of knowledge was adequate, intellectual functioning was average, judgment was fair, and insight was fair (4F at 49-51).

In January 2017, the claimant reported difficulty making decisions in her micro business and that she sometimes wore the same clothes multiple days (5F at 24). She stated that she had one or two friends who were supportive but not all the time, and that she maintained contact with her siblings throughout the year (5F at 24). She stated that she was planning on taking a trip to Colorado that year to see her mother (5F at 19). The claimant had a largely normal mental status exam, with intact concentration, pleasant attitude, intact memory, and normal speech, although her self-care was noted to be poor (5F at 28-32). At a medication management appointment in February 2017 with Dr. Jennifer Palamara, the claimant reported taking her Buspirone regularly and improved relationships with her family (5F at 14). She stated that she felt calmer on the medication but still had difficulties managing stress and making decisions (5F at 14). Her mental status exam was within normal limits and her appearance was noted to be appropriate, her mood was within normal limits, and her thought process and concentration were intact (5F at 15-17).

The claimant reported at an April 2017 appointment with Dr. Palamara that she had made a new friend and completed a new painting in two weeks (5F at 9). However, she also reported gambling more than she wanted to and she had broken her rules by going into her checkbook (*Id.* at 9). Her mental status exam was completely intact except for a sad affect (*Id.* at 9-12). The claimant reported feelings of anxiety at a July 2017 appointment (7F at 3). She reported going through some upsetting things in August 2017 and stated that she was going back to therapy (5F at 4). She stated that she had stopped her medications for a few months and was doing well until recently and had now restarted them (*Id.* at 4). She reported continuing issues dealing with stress (5F at 4). The claimant had a normal mental status exam except for having poor insight and judgment (5F at 4-7).

(PageID.41-44).

## II. The ALJ Properly Evaluated the Opinion Evidence

On September 19, 2017, one of Plaintiff's care providers, Dr. Jennifer Palamara, completed a brief mental impairment questionnaire regarding Plaintiff's impairments. (PageID.605-08). The ALJ, however, afforded little weight to the doctor's observations. (PageID.44). Plaintiff argues that she is entitled to relief because the ALJ's rationale for discounting the opinions in question is not supported by substantial evidence.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating

physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The form which the doctor completed indicates that Plaintiff experiences "moderate" difficulty dealing with work stress and would experience symptoms approximately three hours daily which would cause her to "be off-task." (PageID.606). The doctor also reported that Plaintiff would be absent from work "more than three times a month." (PageID.606). The doctor also completed a form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (PageID.607-08). Plaintiff's abilities

11

were characterized as "moderately limited" in nine categories, "markedly limited" in nine categories, and "not significantly limited" in two categories. (PageID.607-08).

Plaintiff's argument fails for at least two reasons. First, the form that Dr. Palamara completed fails to articulate any functional limitations from which Plaintiff allegedly suffers. Instead, the form, which is unaccompanied by any explanation or documentation, merely articulates unspecific opinions concerning nebulous traits and concepts. Thus, there is nothing in the subject questionnaire which even constitutes a "medical opinion" to which deference must be accorded. *See* 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2) (a medical opinion is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions"); *Pelak v. Commissioner of Social Security*, 2016 WL 6694477 at *7 (W.D. Mich., Nov. 15, 2016) ("ALJs are not bound by conclusory statements of doctors, particularly where they appear on 'check-box forms' and are unsupported by explanations citing detailed objective criteria and documentation"); *Birgy v. Commissioner of Social Security*, 2017 WL 4081528 at *5 (W.D. Mich., Sept. 15, 2017) (same); *Dalton v. Commissioner of Social Security*, 2013 WL 1150711 at *5 n.3 (W.D. Mich., Mar. 19, 2013) (same). Likewise, there is nothing in this questionnaire which is inconsistent with the ALJ's RFC finding.

Second, to the extent the subject questionnaire can be considered to articulate a medical opinion, the ALJ provided good reasons for discounting such. In support of his assessment, the ALJ expressly noted that Dr. Palamara's opinion was contradicted by: (1) Plaintiff's demonstrated ability to manage her business; (2) Plaintiff's favorable response to

12

medication; and (3) the results of numerous examinations which revealed that Plaintiff was less limited than Dr. Palamara suggests. (PageID.44). The ALJ's rationale is supported by the medical evidence discussed above. In sum, the ALJ expressed good reasons, supported by substantial evidence, for discounting Dr. Palamara's opinion. Accordingly, this argument is rejected.

### III. The ALJ's RFC Finding is Supported by Substantial Evidence

A claimant's RFC represents the "most [a claimant] can still do despite [her] limitations." *Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014); *see also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule"). The ALJ concluded that Plaintiff can perform work subject to a number of non-exertional limitations. Plaintiff argues that she is entitled to relief because the ALJ's RFC fails to adequately account for her non-exertional impairments and limitations.

The ALJ is tasked with determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c). While the ALJ may not "play doctor" and substitute his own opinion for that of a medical professional, the ALJ is not required to tailor his RFC assessment to any particular opinion or item of medical evidence. *See, e.g., Poe v. Commissioner of Social Security*, 342 Fed. Appx. 149, 157 (6th Cir., Aug. 18, 2009). Instead, the ALJ is "charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of her residual functional capacity." *Webb v. Commissioner of Social Security*, 368

F.3d 629, 633 (6th Cir. 2004). Plaintiff has identified no specific error with the ALJ's analysis, but instead merely invites the Court to re-weigh the evidence. As previously noted, however, the Court cannot re-weigh the evidence. The ALJ considered all the evidence and articulated an RFC which is supported by substantial evidence. Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: June 14, 2019                        /s/ Ellen S. Carmody
                                                                                ELLEN S. CARMODY
                                                                                U.S. Magistrate Judge